**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JANICE BEASLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 05-0620-KD-B** |
| | ) | |
| **WAL-MART STORES EAST, L.P., et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**ORDER**</u>

This matter is before the court on the motion for summary judgment filed by defendant Wal-Mart Stores East, L.P., supporting brief and exhibits (docs. 36, 37, 38), plaintiff's response to the motion and supporting exhibits (docs. 40, 41) and defendant's reply (doc. 43).  Upon consideration of the foregoing, and for the reasons set forth herein, the Court concludes that defendant Wal-Mart's motion for summary judgment (doc. 36) is due to be **GRANTED** as to plaintiff's claim for sexual harassment based upon a hostile work environment and as to her claim for sexual harassment based upon a tangible employment action (Claim I), invasion of privacy (Claim II), and negligent supervision (Claim IV).

I. <u>Background</u>

At the time relevant to this cause of action, plaintiff was a night shift stock employee at the Wal-Mart store in Monroeville, Alabama.  Albert Stallworth and Aileen Cork were her Shift Supervisors.  Plaintiff alleges that on three occasions over the course of approximately five months (October 2004 to January 2005) prior to her termination on February 11, 2005, Stallworth made comments to her which she interpreted as inappropriate sexual harassment and

that she rebuffed these comments.  After these incidents, plaintiff was present at a pre-shift meeting with Stallworth and other workers when she cursed because Stallworth told her she could no longer wear her Walkman while working.  After this meeting, plaintiff reported Stallworth's allegedly inappropriate comments to Cork.  Also, after this meeting, plaintiff alleges that Stallworth reported her cursing to the Store Manager Alice Plant.  Plaintiff alleges that Plant then told LaSandra Darby, an Assistant Manager, to fire plaintiff if she admitted to cursing even though other employees who cursed at work were not fired.  Plaintiff admitted that she had cursed and she was fired.  Plaintiff told Darby about the harassment and Darby reported it to Plant.  Plaintiff alleges that Plant told Darby that plaintiff was mad because she was fired and Plant did not investigate the allegation of sexual harassment.  (Doc. 40).

Plaintiff filed her complaint against Albert Stallworth and Wal-Mart Stores East, L.P. on October 26, 2005 (Doc. 1).  Initially, plaintiff raised four causes of action - discrimination based upon sexual harassment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, as amended by the Civil Rights Act of 1991, against Wal-Mart (Claim 1); invasion of privacy against Stallworth and Wal-Mart (Claim II); tort of outrage against Stallworth and Wal-Mart (Claim III); and negligent supervision and retention against Wal-Mart (Claim IV). (Doc. 1). In her response to the defendants' motions for summary judgment, plaintiff withdrew her claims for the tort of outrage and negligent retention. (Doc. 40).  Therefore, the only claims remaining against Wal-Mart are plaintiff's claims for sexual harassment under Title VII, invasion of privacy, and negligent supervision. (Id., Doc. 1).[1]

---

[1]  In her response, plaintiff contends that she has asserted a claim for retaliation.  (Doc. 40).  However, defendant argues that plaintiff did not assert this claim in her complaint, did not amend her complaint, and thus, did not file suit on this claim within ninety days of receipt of her

II. <u>Findings of Fact</u>

    1. At or near July 2004, plaintiff began her employment with Wal-Mart as a cashier in Foley, Alabama. (Doc. 38, Exhibit A, p. 17, 26).  In October 2004, she transferred to the Wal-Mart Store No. 1493, located in Monroeville, Alabama where she began work on the overnight shift as a stocker. (<u>Id</u>., p. 18, 29).

    2. At hiring, plaintiff completed an orientation process which included training on Wal-Mart's policies and procedures, including the sexual harassment policy, workplace violence and safety procedures. (<u>Id</u>., p.19-20).  Plaintiff understood that she should report sexual harassment or a hostile work environment to a supervisor, store manager or personnel manager. (<u>Id</u>. p. 20-21, 24-25).

    3. At all time relevant, a copy of Wal-Mart's Harassment Policy was posted by the time clock at both the Foley and Monroeville Stores. (<u>Id</u>., p. 22).

    4. Plaintiff described the first incident which occurred sometime in October 2004, as follows:

---

right-to-sue letter from the EEOC. (Docs. 1, 43).

    Plaintiff checked the box labeled "Retaliation" on her Equal Employment Opportunity Commission Charge of Discrimination, (Doc. 38-7, Exhibit B).  "Retaliation is a separate violation of Title VII"[,] <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571 (11th Cir. 2000), and a careful review of plaintiff's complaint does not reveal that she plead a separate claim for retaliation.  Thus the court will not address a claim that has not been properly pled.

    Additionally, plaintiff appears to have plead a claim for constructive termination.  She alleged that she was "discriminated against on the basis of her sex in the terms and conditions of her employment, including her constructive termination" and that the "defendant's actions were so intolerable that a reasonable person under like circumstances would have resigned her position with this company". (Doc. 1, ¶ 15).  The plaintiff has not offered any facts to support her claim of constructive termination, i.e. that she involuntarily resigned.  Instead, the plaintiff admits that she was fired.   Accordingly, defendant's motion for summary judgment is GRANTED on this claim.

> [T]he first conversation we had . . . was . . . in the food section. . . . [I]t was about strip poker . . . it started out with me and Carmichael . . . talking about [cards and playing "21"].

(Doc. 38, Exhibit A, p. 49, 54-55).

> And [Stallworth] had came over there, and he had got in the conversation . . . he said . . . he had played poker. Well, strip poker with some women, and he had them beat – they had beat him down to his drawers in strip poker. And he had asked me did  . . . – he said y'all play poker? And I think Carmichael's comment was he knew how to play it, and I told him, I said, I didn't know how to play it. And I said I like to play deuce are wilds. And he was like – he said I could teach you how to play strip poker, if you want. And I was like, no, I said I don't play . . . . strip poker. He said I'm going to teach you how to play it. And I said no thank you. I told him I didn't want him to teach me how to play it.

(Id., p. 49-50). After plaintiff told Stallworth that she did not want him to teach her how to play

strip poker, he walked off and she and Carmichael "struck up another conversation, and we went

to putting . . .  the groceries on up." (Id., p. 58). This incident occurred shortly after plaintiff

began work at the Monroeville store in October 2004. (Id., p. 63).

      5. In regard to the second comment, which occurred sometime in December 2004 or

January 2005, plaintiff testified as follows:

> [a]round Christmas holidays and I was over there in health and beauty aid. And they had the candy . . . marked down. And he had went over there, and he had picked up some Hershey Kisses. And he had came over there and he said, . . . you eat Hershey Kisses? And I said . . . yeah, I like Hershey Kisses. And then he was like they got – they got a whole bunch of candy over there marked down. And he said – and he was talking about they're real cheap, he said like 50 cent a bag. And I said, they do. I said what kind of Hershey Kisses they got? And he said the mint kind. I said . . . I don't like those, I don't eat those kind of Hershey Kisses. I said I like the Hershey Kisses with the nuts in it. And his comment was, after I said that, he said you know you like yourself some nuts.

(Doc. 38, Exhibit A, p. 51, 65).

> Plaintiff also testified as follows:

> Q. Okay. So what is it he said on this occasion that you thought was

4

inappropriate?

A.  He said I love myself some nuts.  He said you know you love yourself some nuts.

Q.  What about that was offensive?

A. I mean, it depends on how you look at it.  I mean, he said – it's just nuts.  I mean, I said I don't  – when he said it, I said no, not nuts.  I don't like no – just no any nuts, you know, like that.  I said if its nuts, you know, nuts you eat, yeah, I like Hershey Kisses with the nuts in it.

Q. And prior to him making this, you know you like yourself some nuts comment, you had already told him that you didn't like mint Hershey's Kisses, you preferred Hershey's Kisses with nuts.

A. Yes, sir.

Q. Well, did you ask Mr. Stallworth what he meant by the you know you like yourself some nuts comment?

A. No, sir.

Q. Well, what did you believe he meant by that comment?

A. Like, I thought he meant like, men's nuts.

Q.  Did Mr. Stallworth say that's what he was referring to?

A. No, sir.

(Id., p. 65-66).  Plaintiff told Stallworth that she did not like nuts and did not eat any kind of nuts and "he just walked off". (Id., p. 67).   Plaintiff returned to her work, completed her shift, and did not report the incident. (Id., p. 67).

6.  The third incident occurred later in January 2005, while plaintiff and some co-workers were standing in the electronics department during a break. (Doc. 38, Exhibit A, p. 51, 76). Plaintiff testified that Stallworth passed by and

> we was like doing something, and he was, like - - he asked me, he said you got a boyfriend?  And I said yeah.  And then he said - - he said something else.  I can't remember exactly what he said, and I said - - my comment was to Albert.  I said, well Albert, I said, well – I said can go on and kill that right there.  I said there's no chance that me and you could ever have anything because I said you old enough to be my daddy.  And I said I don't date men that's old enough to be my daddy.  And it was like, when I said that, he had like – it was like he got mad.  He walked off and went over toward the food section and then Ms. Debra said (INDICATING) just like that.  And then – so we were like still over there standing up, and he was, like, didn't I tell y'all to go to work.  And so we had scattered out and went back to our sections and went back to working.

5

(Id., p. 52).  Plaintiff testified that after she answered that she had a boyfriend, Stallworth "was fixing to say something else" but she "just said, Albert I said I can go on and kill that, just like that. . . . I said I don't date men that's old enough to be my daddy.  And I said you about the age of my daddy." (Id., p. 74-75).  Plaintiff testified that during this discussion, Stallworth did not ask her out and that she "just didn't give him a chance to ask whatever he was fixing to ask." (Id., p. 76-77).  Plaintiff testified that following this conversation, Stallworth did not say anything  offensive to her. (Id., p. 77).

7.  Plaintiff never told any manager or personnel manager about these  incidents. (Doc. 38, Exhibit A, p. 30-32).

8.  Plaintiff testified that Stallworth never touched her at any point during her employment, never invited her to dinner, never asked her for sex, never asked her for a date, and never asked questions about her private sex life or about what she and her boyfriend did in the privacy of her or his home. (Id., p. 48, 57-58).[2]

9. Plaintiff testified that she never heard Stallworth make any comments to any other employee that she thought was improper and that no one had complained to her about Stallworth. (Id., p. 91-92).

---

[2]  Interestingly, plaintiff also submitted evidence of a witness who observed the following:

> [Stallworth] and [plaintiff] had conversations that probably were not write (sic), but, I personally didn't hear them.  The only thing I witnessed was one night in electronics the radio was on and it was Marvin Gaye - Let's get it on. [Plaintiff] started dancing and singing, the singing was directed towards him. [Stallworth] ignored her, and he told me he didn't want to say anything to her because there wasn't any other member of management around.

(Doc. 41, Exhibit 4, Handwritten, signed statement of Associate Valerie Byrd, p. 40-41).

10.  Shortly after the boyfriend question incident, at some time later in January 2005, plaintiff used the curse word "shit" at a pre-shift meeting conducted by Stallworth and attended by the night shift employees. (Doc. 38, Exhibit A, p. 83-84, 122-125).  Plaintiff testified that Stallworth told her that she could no longer wear her Walkman on the floor and she said "well, shit, what you going to take next." (Id., p. 124-125).  Plaintiff testified that Stallworth responded by saying that she still could not take the Walkman on the floor. (Id., p. 125).  Plaintiff testified that no other member of the night crew was wearing a Walkman at work (Id., p. 84), and that Stallworth was the only supervisor to make an issue about the Walkman. (Id., p. 123-124).  After this incident, she worked her shift and did not attempt to contact any store manager to ask why she could not wear the Walkman. (Id., p. 85).

11.  Later in January 2005, "right after the incident where [she] cursed in the meeting", after the third comment by Stallworth, plaintiff told Aileen Cork, her shift supervisor, about Stallworth's comments. (Id., p. 82, 59-61).  Plaintiff testified that Cork advised her to tell James Pipes (a regional manager), and that Cork said she would get the phone number for plaintiff. (Id., p. 59-61, 88-89).  Plaintiff stated that Cork never gave her the number and plaintiff did not pursue the matter any further with Cork or any manager. (Id.).  To her knowledge, Cork never told anyone about their conversation. (Id, p. 91).  Plaintiff worked about three more weeks after her conversation with Cork. (Id. at p. 87).[3]

12.  LaSandra Darby testified that on February 11, 2005, Alice Plant, the store manager, told her that Darby would need to terminate plaintiff for cursing and instructed her to speak with

---

[3]  Taking her testimony as true, she was terminated on February 11, 2005, thus this conversation would have occurred around January 21, 2005 and the cursing incident would have occurred shortly before that time, or mid January 2005.

Stallworth about the cursing incident. (Doc. 38, Exhibit C, p. 15, 40, 45-46).  Plant instructed

Darby to first ask plaintiff if the incident occurred and if she said yes, then Darby was to

terminate plaintiff's employment. (Id., p. 16).  Darby testified that Stallworth told her that he had

reported the incident to Plant and that Plant indicated that she would terminate plaintiff.  (Id., p.

17, 40).  When plaintiff arrived at work Darby met with plaintiff and Stallworth.  Plaintiff

admitted to cursing and Darby responded that plaintiff would be terminated. (Id., p. 17-18, 44).

13.  Subsequently, Stallworth was called away from the meeting and while he was gone

plaintiff told Darby about the sexual harassment. (Id., p. 18-19).  Specifically, plaintiff  told

Darby that she felt "like if [she] had of just gave Albert some, you know, some play that [she]

and him could have had something[,] [he] wouldn't have never come to [Darby] with [plaintiff]

saying the word 'shit'". (Doc. 41, Exhibit A, p. 120).  Darby offered to stop the exit interview

and told plaintiff they could speak with Plant about the harassment but plaintiff declined. (Id., p.

19, 42).

14.  After plaintiff was fired, Darby told Plant about plaintiff's statement regarding the

sexual harassment by Stallworth and Plant told Darby that she had never heard anyone say that

Stallworth was harassing plaintiff. (Doc. 38, Exhibit C, p. 19, 42).  Darby testified that Plant told

her that they would talk with Stallworth but Plant thought that plaintiff was mad because she was

terminated. (Id.).  Darby testified that she had never heard any report from any associate

regarding any inappropriate behavior on the part of Stallworth, that she had never observed any

inappropriate behavior on his part, and that no other associate had reported inappropriate

behavior between Stallworth and plaintiff.  (Id., p. 38, 42-43).

15.  In her declaration, Plant stated that she did not recall Darby reporting plaintiff's

allegations to her. (Doc. 38, Exhibit E, p. 4). Plant stated that Wal-Mart's Harassment Policy provided that any associate should report harassment to a hotline number or to a salaried member of management and that Wal-Mart had an open door policy to report harassment. (Id., p. 2). Plant stated that Stallworth and Cork were not salaried members of management and that Cork never reported any discussions she may have had with plaintiff. (Id., p. 2-3). Plant stated that Gale Lett reported that plaintiff had cursed by the time-clock during the pre-shift meeting. (Id., p. 3). Plant stated that she instructed Darby to terminate plaintiff if she admitted to cursing because the use of profanity was considered gross misconduct under Wal-Mart policy, a violation of which made an associate subject to immediate termination. (Id., p. 4).

III.  Conclusions of Law

A. Jurisdiction and Venue

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4); 42 U.S.C. § 2000e, et seq; and 28 U.S.C. §§ 1367, 2201, and 2202. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3).

B. Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a

9

genuine issue of material fact. Id.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should be seldom used in employment discrimination cases because they involve issues of motivation and intent.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." Id. at 1086 (citation omitted).

C.  Plaintiff's Claim I - Title VII - Sexual Harassment

In Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238 (11th Cir. 2004) the Eleventh Circuit Court of Appeals set forth the law of sexual harassment as follows

> To prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. [Mendoza v. Borden's, Inc.,

10

195 F. 3d 1238, 1245 (11th Cir. 1999) (en banc) cert. denied 529 U.S. 1068, 120 S. Ct. 1674 (2000)]; Johnson v. Booker T. Washington Broadcasting Serv., 234 F.3d 501, 508 n.7 (11th Cir. 2000) [footnote omitted].

. . .

Sexual harassment in the workplace can alter the terms and conditions of employment in either of two ways. One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her. That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761, 118 S.Ct. at 2268; see also, Johnson, 234 F.3d at 512.  An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment. See [524 U.S.] at 765, 118 S.Ct. at 2270.

The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. See id. at 754, 118 S.Ct. at 2265. The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be.  Regardless of who is the harasser, the employer may be able to escape liability for a hostile environment by establishing as an affirmative defense that the employee failed to take prompt advantage of the employer's system for reporting and preventing harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); Ellerth, 524 U.S. at 765, 118 S.Ct. at 2270. In that respect hostile work environment harassment is different from tangible employment action harassment.

. . .

"Tangible employment action" is a label used to describe one of two ways sexual harassment can rise to the level of violating Title VII. In Ellerth, the Supreme Court explained that labels like "tangible employment action" and "hostile work environment" are relevant only "to the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." 524 U.S. at 753, 118 S.Ct. at 2265.

11

. . .

> When we talk about tangible employment action and hostile environment, what
> we are or should be talking about are the two alternative ways a plaintiff may
> establish a basis for the employer's vicarious liability, which is the fifth factor of a
> Title VII sexual harassment claim. See id. at 751, 754, 765-66, 118 S.Ct. at 2264,
> 2265, 2271; see also Johnson, 234 F.3d at 508 n. 7.
>
> Where the distinction between the two types of sexual harassment cases does find
> its importance is in connection to the affirmative defense created by the Supreme
> Court to shield employers from liability when they maintain effective anti-sexual
> harassment policies which the plaintiff employee fails to use. This is the
> "Faragher-Ellerth defense." It applies only to employer liability based upon a
> hostile environment theory. It has no effect upon employer liability based upon a
> tangible employment action theory. Faragher, 524 U.S. at 808, 118 S.Ct. at 2293;
> Ellerth, 524 U.S. at 765, 118 S.Ct. at 2270.

Hulsey, 367 F. 3d at 1245-1246.

Plaintiff asserts that Wal-Mart is liable for the alleged conduct of Stallworth because she

was subject to both types of harassment.  First, plaintiff alleges that prior to her termination, she

was subjected to sexual harassment by Stallworth which was sufficiently pervasive and severe as

to create a hostile work environment. (Docs. 1, 40).  Second, plaintiff alleges that because she

rebuffed Stallworth's alleged advances, she was made subject to a tangible employment action,

i.e. termination. (Id.)

### 1. Hostile Work Environment

 A hostile work environment under the fourth element of a sexual harassment claim,

Hulsey, 367 F. 3d at 1245,  is one that "is permeated with discriminatory intimidation, ridicule,

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510

U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (citations and internal quotations omitted).  In order to be

actionable under Title VII, a hostile work environment must be both objectively and subjectively

offensive, "one that a reasonable person would find hostile and abusive", and one that "the victim in fact did perceive to be so." <u>Mendoza</u>, 195 F.3d at 1244, quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. at 21-22, 114 S.Ct. at 370 (1993).[4]

The Supreme Court has identified a four-factor analysis for an objective determination: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Mendoza,</u> 195 F. 3d at 1246; <u>see</u> <u>Faragher</u>, 524 U.S. at 787-788, 118 S.Ct. at 2283. The court should "examine the conduct in context, not as isolated acts, and [consider] the totality of the circumstances." <u>Id.</u>; <u>Hulsey</u>, 367 F.3d at 1248, citing <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1276 (11th Cir. 2002) ("In a sexual harassment case the totality of the circumstances must be considered, because context is important.")  Thus, an employee's subjective belief that the alleged harassment is severe or pervasive is not sufficient. The court must also make an objective determination as to whether the harassing conduct is sufficiently severe or pervasive to be actionable under Title VII.  <u>Harris,</u> 510 U.S. at 21-22; 114 S. Ct. at 370; <u>Faragher</u>, 524 U.S. at 787, 118 S.Ct. at 2283. In other words, in order to be actionable under Title VII, the conduct must be extreme.  Offhand comments, simple teasing, and "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" and do not create a sexually-harassing hostile work environment. <u>Faragher</u>, 524 U.S. at 788-89; 118 S.Ct. at 2283.

---

[4] "Although Title VII itself does not mention sexual harassment, it has long been settled that the statutory phrase 'terms, conditions, or privileges of employment' includes within its scope a discriminatorily hostile or abusive environment." <u>Hulsey</u>, 367 F.3d at 1244, citing <u>Mendoza</u>, 195 F.3d at 1244.

Stallworth was one of plaintiff's immediate supervisor during the approximate five month period of time she worked at the Monroeville Wal-Mart. The three comments which plaintiff alleges supports her complaint are as follows: A question from Stallworth as to whether plaintiff would like for Stallworth to teach her to play strip poker coupled with a statement that Stallworth had once been beaten down to his drawers by some women; a comment from Stallworth that plaintiff knew she "liked herself some nuts" which plaintiff perceived to mean men's nuts, although she had just told Stallworth that she liked the Hershey's Kisses which contained nuts; and a question from Stallworth as to whether plaintiff had a boyfriend, made in front of a group of co-workers, which plaintiff did not answer. Instead plaintiff cut off the conversation, because she believed that Stallworth was about to ask her for a date, and told Stallworth that she did not date men who were old enough to be her father. (Docs. 1, 40).

Wal-Mart argues that these three isolated occurrences are not of the frequency or severity necessary to establish an objectively hostile work environment claim. Specifically Wal-Mart argues that the comments made by Stallworth were not overtly sexual because he never asked plaintiff for sex or engaged in any conduct in a sexual manner, were not physically threatening and did not interfere with plaintiff's ability to complete her work. (Doc. 37).

Plaintiff responds that the evidence supports that subjectively she perceived Stallworth's three comments as sexual in nature and that the comments pervaded her work environment such that it was both hostile and abusive. Plaintiff also argues that the evidence objectively establishes that Stallworth's three comments were inappropriate and suggestive behavior which created a hostile environment which affected her ability to perform her job. Plaintiff also responds that because she told Cork about the alleged harassment, a report which Darby testified

14

would satisfy the requirements of notice under the Wal-Mart sexual harassment policy, Wal-Mart cannot argue that plaintiff did not follow the provisions of the policy.[5]  Plaintiff responds that because Plant did not investigate the alleged harassment when Darby told her, Wal-Mart cannot argue that it took appropriate corrective action.  (Doc. 40).[6]

Upon consideration of evidence presented, the court finds that Stallworth's alleged conduct as a matter of law is not sufficiently "severe and pervasive" to create a jury question as to whether a hostile work environment existed which would violate Title VII.  The comments regarding strip poker and nuts, assuming they were meant to be sexual in nature, are at best "[m]ere 'sex talk,' [which] without more, does not rise to the level of objectively severe and pervasive harassment." Howard v. City of Robertsdale, 168 Fed. Appx. 883, 889-90 (11th Cir. 2006) (citations omitted).  See also, Faragher, 524 U.S. at 788, 118 S.Ct. at 2283-2284 ("Properly applied, [the standard for judging hostility] will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'").  As to the question about plaintiff's boyfriend,

---

[5] Plaintiff makes this statement but does not cite to any point in Darby's deposition where she testified that plaintiff's telling Cork about the three incidents was sufficient to put Wal-Mart on notice.  To the contrary, plaintiff testified that Cork was going to get a phone number for plaintiff to call to report the harassment to a member of management, but Cork failed to do so and plaintiff never followed through.  In her declaration, Plant stated that Cork was not a salaried member of management and that they were the class of employees to whom claims of sexual harassment should be reported according to Wal-Mart's sexual harassment policy. (Doc. 38, Exhibit E, p. 2-3).

[6] Plaintiff does not raise any argument that she was not trained upon or made aware of Wal-Mart's harassment policy or that she was not aware of the information in the break room regarding members of management.  Thus, she has abandoned any argument on the Ellerth-Faragher affirmative defense that Wal-Mart exercised reasonable care to prevent sexual harassment.

in Gupta, 212 F.3d at 578, 585, the Eleventh Circuit Court of Appeals found that the supervisor's persistent asking of plaintiff to lunch was not "severe, threatening, or humiliating," and stated that the court "cannot mandate that an employer be required to ensure that supervisors never ... ask [subordinates] to lunch."). If persistently asking a subordinate for a lunch date is not considered severe, humiliating or threatening, then surely cutting off the question before it is asked also cannot be considered severe, humiliating or threatening.

In sum, resolving all inferences in favor of plaintiff and taking all of plaintiff's allegations as true, the conduct complained of does not rise to the level of severe and pervasive sexual harassment actionable under Title VII. Viewing the totality of the circumstances, the alleged comments occurred only three times over a five month period of time, the comments were not severe, plaintiff was never physically threatened (she testified that Stallworth never touched her, never asked her for a date, never asked her for sex) and after each occurrence, she testified that she returned to her work without difficulty, thus the comments did not unreasonably interfere with her work performance. The comments were "mere offensive utterances." Faragher, 524 U.S. at 789, 118 S.Ct. at 2284.

Additionally, because the court has determined that plaintiff has not alleged sufficient facts to support her claim of a hostile work environment, the court need not address whether the Faragher-Ellerth affirmative defense that plaintiff failed to take prompt advantage of Wal-Mart's system for reporting and preventing harassment is applicable. Hulsey, 367 F. 3d at 1245-1246. Accordingly, Wal-Mart's motion for summary judgment as to plaintiff's hostile work environment claim is due to be granted.

2.  Tangible Employment Action - (Quid Pro Quo)[7]

Wal-Mart argues that viewing the evidence in the light most favorable to plaintiff,

plaintiff cannot establish a claim of sexual harassment under a tangible employment action Title

VII theory.   Specifically Wal-Mart argues that plaintiff did not suffer the tangible adverse

employment action, i.e. termination, because of Stallworth's alleged harassment but instead

plaintiff committed a violation of company policy which lead to her termination.   Thus, Wal-

Mart argues that plaintiff cannot prove a causal link between her termination and Stallworth's

alleged harassment.   Wal-Mart argues that the causal link was severed because of the undisputed

facts that plaintiff cursed at Stallworth in front of the entire night shift crew during the pre-shift

meeting, she had never cursed at a meeting before, and she had never heard any other associate

curse during a meeting.   Wal-Mart also argues that neither Plant nor Darby had any knowledge

of plaintiff's allegations against Stallworth before Plant and Darby decided to terminate plaintiff.

(Doc. 37, 43).

Plaintiff responds that after she rejected Stallworth's advances, he reported her for

cursing which resulted in her termination, i.e., a tangible employment action.   Plaintiff argues

that a fact-finder can infer that her termination was discriminatory because Stallworth harassed

her, was angry because she rejected him, told Plant about the cursing incident which resulted in

her termination within a few days of rejection, but did not report other employees who had also

cursed.   Plaintiff argues that this close proximity in time creates a clear nexus between his report

---

[7]  The Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753-54, 118
S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998), instructed that the term "quid pro quo" should no
longer be used and the courts now use the term "'tangible employment action' to refer to
harassment that culminates in a discharge, demotion, or undesirable reassignment. Hulsey v.
Pride Restaurants, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004) (citations omitted).

and her termination.  Plaintiff argues that even though Plant actually made the termination

decision, there is an unbroken causal link because Plant followed Stallworth's biased

recommendation without independent investigation.  Plaintiff also argues that evidence from

Darby and the other employees establishes that other employees cursed but were not reported for

their actions which indicates that cursing was not a legitimate reason for her termination.  In

sum, plaintiff argues that based upon the disputed evidence a reasonable jury could determine

that the real reason she was terminated was her refusal of Stallworth's unwelcome sexual

advances and that Plant's failure to investigate the real reason, renders Wal-Mart responsible.

(Doc. 40).

 The essential aspect of the tangible employment action theory, is that the tangible adverse

employment action, i.e., plaintiff's termination, was causally related to the alleged sexual

harassment.  Hulsey, 367 F.3d at 1245 citing Ellerth, 524 U.S. at 753, 118 S.Ct. 2257; Cotton v.

Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231(11th Cir. 2006)("There also must be

a causal link between the tangible employment action and the sexual harassment.").  Assuming

that plaintiff could prove that Stallworth's statements were sexual harassment, the plaintiff's

case fails because she has not presented sufficient evidence for a reasonable jury to find that

there was a causal link between the sexual harassment and the plaintiff's termination.

 Plaintiff has failed to present evidence to dispute that Plant made the decision to

terminate the plaintiff based on the plaintiff's misbehavior and that when she made this decision

she was unaware of plaintiff's complaint of sexual harassment against Stallworth.  Although

Stallworth was plaintiff's supervisor he did not terminate the plaintiff.  However, there is some

evidence that Stallworth reported to Plant the offense which led to plaintiff's termination.

Moreover, there is evidence that this report occurred in close proximity to plaintiff's rebuff of

Stallworth's alleged attempt to ask her out.  When the alleged harasser did not make the decision

to terminate the plaintiff, precedent instructs as follows:

> [I]n some cases, a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge. <u>Zaklama v. Mt. Sinai Medical Center</u>, 842 F.2d 291, 294 (11th Cir.1988). However, as we have recently explained, this causation must be truly direct. When the biased recommender and the actual decision-maker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee. <u>Llampallas</u> [<u>v. Mini-Circuits, Lab, Inc.</u>], 163 F.3d [1236]at 1248 [11th Cir. 1998].
>
> One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus. <u>Id</u>. at 1249.

<u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1331-1332 (11th Cir. 1999).

In this case, the plaintiff has not produced sufficient evidence to establish that the

decision to terminate her was directly caused by Stallworth's recommendation.  As an aside,

there is no direct evidence that Stallworth recommended that plaintiff be fired, there is only

evidence that he reported the offense.[8]  However, assuming that his report was taken as a

recommendation for termination, Wal-Mart did not automatically terminate the plaintiff based on

---

[8] Plaintiff relies upon Darby's testimony that Stallworth told her that he had reported plaintiff for cursing. (Doc. 40, p. 3) However, Stallworth testified that he did not report the incident. (Doc. 38, Exhibit B, p. 41-42, 44, 51-52).  Also in her declaration, Plant stated that Lett told her of the cursing incident and not Stallworth.  (Doc. 38, Exhibit E, p.3).

Stallworth's report.  Plant specifically required that Darby inquire with plaintiff whether she had

violated store policy and then terminate her if plaintiff admitted the offense.  The plaintiff

admitted the offense and was terminated.  Wal-Mart's need to further independently investigate

the misconduct was made unnecessary by the plaintiff's admission to the offense.[9]  Plaintiff has

presented no evidence to dispute that the final decision to terminate was made only after her

admission of misconduct.

Upon consideration of the evidence presented and viewing that evidence in the light most

favorable to the plaintiff, the courts finds that there is not a genuine issue of material fact and

thus summary judgment is due to be granted on this claim.

D.  <u>Plaintiff's State Law Claims</u>

1)  <u>Invasion of Privacy (Claim II)</u>

Plaintiff alleges that Wal-Mart is liable for the alleged invasion of her privacy by

Stallworth because his actions were taken in the line and scope of his duty and his conduct was

authorized, ratified, and/or condoned by Wal-Mart. (Doc. 1).

Defendant Wal-Mart argues that Stallworth's three isolated comments are insufficient as

a matter of law to establish an intrusion upon one's seclusion or solitude, or matters of a private

nature, such that plaintiff could maintain her invasion of privacy claim.  Wal-Mart argues that

plaintiff cannot show that the comments resulted in any outrage, mental suffering, shame, or

---

[9]The plaintiff appears to argue that under the "cat's paw" theory defendant was required
to independently investigate Stallworth's alleged misbehavior before terminating plaintiff.
However, the court in <u>Stimpson</u> is clearly referring to an independent investigation into the
plaintiff's misconduct which formed the basis of the termination.

humiliation, on her part.[10]  Wal-Mart asserts that there is no genuine issue of material fact as to this claim and it is entitled to judgment as a matter of law. (Docs. 37, 43).

In the section titled "Invasion of Privacy" under the caption of "State Law Claims", plaintiff responds that Wal-Mart knew of and failed to stop Stallworth's intrusive conduct and thus invaded her privacy. (Doc. 40).  In a footnote, plaintiff adopted her prior argument and evidence presented in support of her sexual harassment claims. (Id.)

Generally, an employer is liable for the intentional torts of its employee when "(1) the employee's acts are committed in furtherance of the business of the employer; (2)  the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts. Ex Parte Atmore Community Hospital v. Hayes, 719 So. 2d 1190, 1194 (Ala. 1998) citing Potts v. BE & K Construction Co., 604 So.2d 398, 400 (Ala. 1992).  However, the plaintiff must first establish an underlying tortious act on the part of the employee. Potts, 604 So. 2d 400 (holding that to establish an employer's liability for an offending employee's conduct in a sexual harassment case, the plaintiff must prove the "underlying tortious conduct of an offending employee" in addition to showing "that the employer (1) had actual knowledge of the tortious conduct . . .; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation").

Because this court has granted summary judgment in favor of Stallworth as to plaintiff's

---

[10]  Wal-Mart also acknowledges plaintiff's allegation in her response that Stallworth had touched her.  However, as Wal-Mart points out, there is no evidence in the record to support her statement. (Doc. 40, 43).

claim for invasion of privacy (Doc. 51), plaintiff is without an underlying State common law tort to form the basis of her claim that Wal-Mart's participation, authorization or ratification of Stallworth's actions constituted an invasion of privacy. Id.  Since plaintiff has failed to establish the existence of an underlying tort claim, this court need not address the factors set forth in Potts or Ex Parte Atmore Community Hospital.  Accordingly, Wal-Mart is entitled to summary judgment in its favor as a matter of law as to plaintiff's Claim II for invasion of privacy.

2) Negligent Supervision (Claim IV)[11]

Plaintiff claims that Wal-Mart negligently supervised its employees after plaintiff reported Albert Stallworth's conduct.  Plaintiff claims that Wal-Mart had actual knowledge of the supervisor's conduct, knew or should have known that the conduct constituted sexual harassment, and failed to take adequate steps to remedy the situation. (Doc. 1).[12]

Defendant Wal-Mart argues that the State of Alabama does not recognize an independent claim for negligent supervision premised on the failure to investigate a sexual harassment claim and that this is an attempt to create liability under a respondeat superior theory for an underlying tort engaged in by an employee.  Wal-Mart argues that plaintiff must first prove Stallworth's underlying wrongful conduct of invasion of privacy or outrage and that absent such proof, no liability can attach to it.  Wal-Mart also argues that even should an underlying tort be established, it is not liable because plaintiff failed to give Wal-Mart sufficient information to put

---

[11]  Plaintiff withdrew her claim for negligent retention in her response to the motion for summary judgment. (Doc. 40).

[12] In paragraph 31 of her complaint plaintiff asserts that Wal-Mart "acted with malice and/or reckless indifference toward the plaintiff." (Doc. 1).  However, in her response to the motion for summary judgment, she raises no argument and points to no facts to support this portion of her claim.

it on notice of Stallworth's alleged actions prior to plaintiff's termination. (Doc. 37, 43).

In the section entitled, "State Law Claims", plaintiff responds that Wal-Mart can be held liable for Stallworth's actions if they were done in the line and scope of employment and in furtherance of the business, or can be held directly liable if Wal-Mart participated in, authorized, or ratified Stallworth's actions after it learned of his actions.  Plaintiff argues that under Alabama law, a reasonable jury could find that Wal-Mart had actual knowledge of Stallworth's tortious acts toward plaintiff, that Wal-Mart knew or should have known that this conduct "constituted sexual harassment and/or a continuing tort", and that Wal-Mart failed to take adequate steps to remedy the situation. (Doc. 40).

Under Alabama law, negligent supervision is a legal theory by which a claim of sexual harassment may be brought.  "It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." Stevenson v. Precision Standard, Inc., 762 So.2d 820, 825 n.6 (Ala. 1999) (citations omitted); Taylor v. Stevenson, 820 So.2d 810, 812 (Ala. 2001) (in addressing Stevenson's malpractice claim against her attorneys Taylor and Smith, the "Court reasoned, in essence, that Pemco [the employer] could not be independently guilty of negligence or wantonness in training or supervising Windsor [the offending employee] in the absence of some tort committed by him against Stevenson."); see also University  Federal Credit Union v. Grayson, 878 So.2d 280, 291 (Ala. 2003) (citations omitted) (finding that a plaintiff must establish an underlying common-law tort in order to prevail in a claim for negligent supervision).  In Stevenson, the Supreme Court of Alabama explained that the employer

23

> cannot be held liable for authorizing or ratifying conduct that, according to the
> jury, did not occur. Accordingly, a verdict against [the employer] based on a
> finding of negligent training and supervision would be inconsistent with a verdict
> exonerating [the employee].

762 So. 2d at 825; see Jackson v. Cintas Corp., 391 F. Supp.2d 1075, 1100-1101 (M.D.Ala.

2005) ("Further, the 'incompetency' of the offending employee in a negligent supervision claim

must be based on an injury resulting from a tort which is recognized under Alabama common

law.").   Moreover, in Thrasher v. Ivan Leonard Chevrolet, 195 F.Supp.2d 1314, 1319 (N.D. Ala.

2002), the Northern District of Alabama explained:

> In order to establish a claim against an employer for negligent supervision,
> training, and/or retention, the plaintiff must establish that the allegedly
> incompetent employee committed a common-law Alabama tort. As Alabama does
> not recognize a common-law tort for sex discrimination in employment, the Court
> finds that Plaintiff cannot maintain an action for negligent supervision, training,
> and/or retention based upon conduct that is employment discrimination, but does
> not support a common law tort.

Id.   The undersigned agrees with the interpretation of state law in Thrasher.

Thus, Wal-Mart cannot be held liable for plaintiff's State law claim of negligent

supervision unless plaintiff has established her only remaining State law tort claim of invasion of

privacy.  In that regard, this court has found that defendants Stallworth (Doc. 51) and Wal-Mart

are entitled to summary judgment as to plaintiff's claim of invasion of privacy.  Therefore,

plaintiff is without an underlying State law tort claim to form the basis of her claim for negligent

supervision.  Accordingly, Wal-Mart is entitled to summary judgment in its favor as a matter of

law as to plaintiff's Claim IV for negligent supervision.

IV. Conclusion

Upon consideration of the pleadings and evidence and for the reasons set forth herein, the undersigned finds that there is no genuine dispute of material fact as to plaintiff's claims for sexual harassment (Claim I), invasion of privacy, (Claim II), and negligent supervision (Claim IV) and that defendant Wal-Mart's motion for summary judgment is **GRANTED** as to those claims.

**DONE** and **ORDERED** this the 29th day of November, 2006.

**s / Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**